2 F.3d 1156
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Otokar GROHMANN, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 91-70677.
 United States Court of Appeals, Ninth Circuit.
 Submitted Aug. 6, 1993.*
Decided Aug. 10, 1993.
 
 Before: SCHROEDER, FLETCHER and ALARCON, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Otokar Grohmann, a native of Czechoslovakia, appeals the BIA's summary dismissal of his appeal from the IJ's denial of his application for asylum and withholding of deportation. Because summary dismissal was appropriate, we affirm.
 
 FACTS AND PROCEDURAL HISTORY
 
 3
 Otokar Grohmann is a 29-year-old native of Czechoslovakia. At his asylum hearing, he testified that he was raised in Senica, a town of 16,000 in Slovakia, where he and his family were not permitted to practice their Catholic faith. In February 1988, Grohmann attended a peaceful demonstration in support of religious freedom and was reading a pamphlet when police took him into custody. According to petitioner, the police did not ask him anything; they simply took him to the police station, where they detained him for two hours.
 
 
 4
 At the time of his arrest, Grohmann was working for the government railroad. He had taken this job in lieu of military service. After the incident with the police, his supervisor at the railroad warned him that if there were "going to be some kind of problem[,]" Grohmann would have to leave the railroad and serve in the military. (Certified Administrative Record ("C.A.R.") at 44.) Petitioner did not lose his job at the railroad, however. Prior to working for the railroad petitioner had been a manager of a store, and his bosses there tried to make him join the communist party. He refused to join the party and was almost fired.
 
 
 5
 Grohmann further related that following his arrest at the demonstration, local authorities placed him and his family under investigation. Their phone calls were monitored and, according to petitioner, "strange people" began talking with his friends. (C.A.R. at 20.)
 
 
 6
 In mid-April 1988, Grohmann boarded a plane in Prague, ostensibly to take a vacation in Cuba. When the plane stopped in Montreal, Canada, petitioner disembarked and went to the restroom. There, he pulled a fire alarm, and told the Canadian police who responded that he wished to go to the United States to seek asylum. The Canadian authorities advised him to apply for asylum in Canada instead. Grohmann did so, and Canada granted him residency status.
 
 
 7
 Petitioner worked at several jobs in different parts of Canada until December 1988, when he entered the United States through Blaine, Washington. He subsequently flew to Anchorage.
 
 
 8
 On December 28, 1988, Grohmann submitted an asylum application to the INS. On June 6, 1989, the State Department issued an advisory opinion letter stating that Grohmann had a well-founded fear of persecution. The INS district director apparently never reached a determination on the asylum application.
 
 
 9
 On February 9, 1990, the INS issued an order to show cause which charged that Grohmann was subject to deportation pursuant to 8 U.S.C. Sec. 1251(a) because he had entered the United States without inspection. At the outset of his deportation hearing, petitioner admitted deportability, but indicated that he wished to pursue his asylum claim. At this juncture the IJ recessed the proceedings, noting that he wanted to obtain a more current report from the State Department in light of the recent political developments in Czechoslovakia. On June 4, 1990, the State Department issued a second advisory opinion, which states:
 
 
 10
 Our records indicated that on June 6, 1989 we forwarded a determination that the applicant had a well-founded fear of persecution. Since that date much has taken place in Czechoslovakia and it would be difficult to render the same opinion today. The new government has committed itself to free elections, freedom of speech, religion and association. Political prisoners have been released and many of them are now in the government. Passports are now freely and expeditiously issued. Czechoslovak nations abroad have been invited to return either as visitors or returning residents.
 
 
 11
 (E.R. at 107.)
 
 
 12
 On December 5, 1990, an asylum hearing was held in Anchorage. At the hearing, Grohmann explained that he left Czechoslovakia because of his problems with the communist party. Petitioner also gave as a reason for seeking asylum his desire to practice the Catholic faith. Grohmann testified that his family members in Slovakia continue to be harassed by authorities and that their jobs are in jeopardy as a result of his defection. The personal property he left behind has been confiscated and proceedings have been instituted against him because of his failure to fulfill his military service. He believes that it might be difficult for him to obtain employment if he returns to Senica because of his "past" and that the authorities will be "watching" him. (C.A.R. at 52.)
 
 
 13
 According to Grohmann, most of the people who were in power in Senica when he left are still in power. His parents informed him that the communists won the 1990 election in Senica. He is aware of the broader political changes that have taken place in Czechoslovakia, however, including the open democratic elections in 1990.
 
 
 14
 After considering Grohmann's testimony, the IJ rendered an oral decision denying his applications for asylum and withholding of deportation but granting him the right to depart voluntarily. Petitioner filed a timely appeal to the BIA. His notice of appeal listed the following reasons for his appeal:
 
 
 15
 a. The immigration judge did not give proper weight to the evidence of religious and political persecution which provided the reasonable fear of persecution should he return to Czechoslovakia.
 
 
 16
 b. Notwithstanding that the national leadership of Czechoslovakia is enlightened, the judge ignored the reality that the communist tyrants who control the local government in Respondent's town are still in charge there.
 
 
 17
 c. The judge should have applied Matter of Chen, I.D. 3104. (C.A.R. at 11.) Grohmann did not file a brief in support of his appeal. On October 25, 1991, the BIA summarily dismissed Grohmann's appeal pursuant 8 C.F.R. Sec. 3.1(d)(1-a)(i) in accordance with its finding that Grohmann had "in no meaningful way identified the basis of his appeal." (C.A.R. at 3.)
 
 
 18
 Petitioner now seeks judicial review of the BIA's dismissal.
 
 DISCUSSION
 A. Summary Dismissal
 
 19
 INS regulations provide that the BIA may dismiss summarily any appeal in which "the party concerned fails to specify the reasons for the appeal." 8 C.F.R. Sec. 3.1(d)(1-a)(i) (1991).[1] This circuit has not clearly articulated a standard of review for summary dismissal of an appeal by the BIA. Toquero v. INS, 956 F.2d 193, 194 (9th Cir.1992). Generally, we consider whether such a dismissal was "appropriate," keeping in mind that the BIA has strictly interpreted the specificity requirement of section 3.1(d)(1-a)(i). Id. at 194-95; see also Reyes-Mendoza v. INS, 774 F.2d 1364, 1365 (9th Cir.1985) (summary dismissal "appropriate"). The BIA considers a notice of appeal insufficient if it "merely assert[s] that the immigration judge improperly found that deportability had been established or denied.... Where a question of law is presented, supporting authority should be included, and where the dispute is on the facts, there should be a discussion of the particular details contested." Toquero, 956 F.2d at 195 (quoting Matter of Valencia, Interim Decision No. 3006, 2-3 (BIA 1986) (citation omitted)) (emphasis omitted).
 
 
 20
 Grohmann's first two reasons for appeal take issue with the IJ's finding that he failed to establish a well-founded fear of persecution. They do not specify under what legal standard the IJ neglected to "give proper" weight to the evidence of persecution, however. Although petitioner states that the IJ "ignored" his testimony that the communists still controlled the town of Senica, we note that the IJ explicitly referred to this aspect of Grohmann's testimony in his decision. Finally, Grohmann's reference to Chen does not explain why the IJ should have considered it controlling.[2]
 
 
 21
 Even if it is assumed that the BIA had sufficient notice of the grounds for the appeal, however, Grohmann has not established that the IJ's decision was erroneous.
 
 B. Estoppel
 
 22
 Grohmann contends that the United States is estopped from asserting the more favorable political climate in the former Czechoslovakia to the detriment of his asylum application because the original State Department opinion indicated that his fear of persecution was well founded. He further asserts that the INS purposely delayed adjudicating his asylum application with the knowledge that the events in his homeland would eventually cause it to be disposed of unfavorably. He claims he was prejudiced by the INS' actions in that he has now lost his residency status in Canada.
 
 
 23
 Grohmann's arguments are unavailing. Under the regulations in effect at the time of his asylum hearing, the IJ was authorized to obtain a second opinion from the State Department if the circumstances in Czechoslovakia had "changed so substantially since the first opinion was provided that a second opinion would materially aid in adjudicating the asylum request." 8 C.F.R. Sec. 208.10(b) (1990). The first State Department opinion in Grohmann's case was issued in June of 1989. In December 1989, Vaclav Havel, a human rights activist, was elected President of Czechoslovakia and the communists ceased to control the national government. House Comm. on Foreign Affairs and Senate Comm. on Foreign Relations, 101st Cong., 2d Sess., Country Reports on Human Rights Practices for 1989 1072 (Joint Comm. Print 1992). These changes were substantial enough to justify a second State Department opinion.[3]
 
 
 24
 The Ninth Circuit has held that in order to assert estoppel against the government, it must be shown that the government engaged in "affirmative misconduct." Watkins v. United States Army, 875 F.2d 699, 707 (9th Cir.1989) (en banc), cert. denied, 498 U.S. 957 (1990); see also INS v. Miranda, 459 U.S. 14, 17 (1982) (before reaching question of estoppel, it must be determined as initial matter whether there was a showing of affirmative misconduct on part of INS). Petitioner points to the fourteen-month delay between the time he filed his application for asylum and the IJ's decision to obtain a second advisory opinion as evidence of the government's alleged misconduct. That delay, standing alone, does not give rise to an inference of bad faith on the part of the government. Cf. Miranda, 459 U.S. at 18 (INS' eighteen-month delay in processing application did not constitute misconduct). Grohmann has presented no other evidence to support his claim that the INS engaged in any wrongdoing.[4] The fact that he lost his residency status in Canada was the result of his decision to risk it by coming to the United States.
 
 C. Lack of Interpreter
 
 25
 Grohmann's claim that he was denied due process because he was not afforded an interpreter at his asylum hearing is baseless. Neither he nor his counsel requested a translator at the hearing. That Grohmann misused a single English word and failed to understand one other is insignificant. The transcript of the proceeding indicates that he was able to communicate effectively in English.
 
 D. Ineffective Assistance of Counsel
 
 26
 Grohmann contends he was deprived of due process as a result of his counsel's failure to file a brief in support of his BIA appeal. Ineffective assistance of counsel in a deportation proceeding is a denial of due process only if the proceeding was thereby rendered fundamentally unfair. Ramirez-Durazo v. INS, 794 F.2d 491, 499-500 (9th Cir.1986). As the foregoing discussion demonstrates, petitioner's challenge to the IJ's decision lacks merit. Thus, the BIA's dismissal was not fundamentally unfair.
 
 
 27
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The 1993 regulations contain a substantially similar provision. See 8 C.F.R. Sec. 3.1(d)(1-a)(i)(A)
 
 
 [2]
 Petitioner does not seek to rely on Chen in his appeal to this court
 
 
 [3]
 In this regard, we note that the IJ did not find credible Grohmann's assertions that circumstances remained unchanged in Senica and that he was likely to face persecution if he returned. Grohmann does not challenge the IJ's credibility finding on this issue, which is entitled to substantial deference from this court so long as it is supported by "specific, cogent reason[s]." Berroteran-Melendez v. INS, 955 F.2d 1251, 1256 (9th Cir.1992) (quoting Turcios v. INS, 821 F.2d 1396, 1399 (9th Cir.1987)). The IJ explained that he rejected Grohmann's claim of persecution because he found Grohmann's testimony on this point to be inconsistent, speculative, and lacking in specificity
 
 
 [4]
 We note that the district director's failure to issue a written decision on Grohmann's asylum application prior to the institution of the deportation proceedings against him was an occurrence explicitly contemplated under the INS regulations in effect at the time, under which the IJ had exclusive jurisdiction of the asylum application once the order to show cause was served. 8 C.F.R. Sec. 208.1(b) (1990) ("Except upon the motion of the district director, an immigration judge shall not remand an application or terminate a proceeding on the ground that the district director has failed to adjudicate an asylum application filed, or allegedly filed, prior to the issuance of the order to show cause...."); see also 8 C.F.R. Sec. 208.2 (1993) (similar provision)